Upon review of the competent evidence of record, and upon reconsideration of the evidence, the Full Commission MODIFIES the Opinion and Award of the deputy commissioner. The Full Commission affirms the conclusion that plaintiff sustained an occupational disease in the course and scope of her employment, but reverses the conclusion concerning the extent of the compensable injury and the resulting disability.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Commission and this is the forum of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to misjoiner or nonjoiner of parties.
3. Plaintiff's alleged date of injury is June 23, 1998.
4. On June 23, 1998, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
5. On June 23, 1998, and employer-employee relationship existed between plaintiff and defendant-employer.
6. Insurance Company of the State of Pennsylvania was the compensation carrier for defendant-employer on June 23, 1998.
7. Judicial Notice is taken of the following Industrial Commission forms on file:
a. Form 19 dated June 24, 1998;
b. Form 18 dated September 2, 1998;
c. Form 33 dated September 3, 1998;
d. Form 33R dated November 10, 1998; and,
e. Form 61 dated July 20, 1998.
8. Plaintiff's average weekly wage is to be determined by a Form 22.
9. The following documents were stipulated into evidence at the deputy commissioner hearing:
 a. Stipulated Exhibit #1, Plaintiff's medical records and state vocational rehabilitation records;
b. Stipulated Exhibit #2, Form 22; and,
c. Stipulated Exhibit #3, Plaintiff's recorded statement.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner plaintiff was thirty-five (35) years of age. Plaintiff completed the 10th grade and had received a GED. Prior to employment with defendant-employer, plaintiff worked in a convenience store operating a cash register, in a daycare center, and in a sales position. The record failed to show any special skills or license beyond this level of education and experience.
2. Plaintiff testified that she had no previous problems with her hands, wrists and arms prior to her employment with defendant-employer. The health care providers testified that they had no history of plaintiff having problems with her hands, wrist and arms prior to her employment with defendant-employer.
3. Plaintiff began employment with defendant-employer on February 3, 1998. Plaintiff worked the 10:00 P.M. to 7:00 A.M. shift.
4. Plaintiff's job duties with defendant-employer required her to unpack shipping boxes, stock shelves, and "break down" more than a hundred boxes by hand. These activities involved repetitive use of her hands, wrists and arms. Specifically, the work involved extensive use of a "box cutter," a hand-held tool with a razor edge used to cut corrugated cardboard boxes. In her job duties, plaintiff "broke down" and cut in excess of 100 boxes per shift. Plaintiff is right handed and used her right hand in using the box cutter.
5. Over the course of her employment with defendant-employer, plaintiff began to experience pain and numbness in her hands and wrists while performing her job duties. The symptoms were bilateral, but worse on the right side.
6. On June 23, 1998, plaintiff's symptoms became much worse while breaking down boxes. She reported her symptoms to Joe McDonald, the assistant manager. Another employee, Shirley Adams, took plaintiff to the company doctor, Knightdale Primary Care, where plaintiff was examined and initially diagnosed with a bilateral repetitive motion injury. Plaintiff was given wrist splints, prescription medication, and assigned work restrictions of lifting not more than 10 pounds, wearing splints at work, and limiting the use of both hands to 40 minutes per hour.
7. Defendant-employer did not have a position on the third-shift (generally 10:00 P.M. to 7:00 A.M) which, in the opinion of defendant-employer's store manager, did not require repetitive motion.
8. The employer's store manager testified that she orally offered plaintiff post-injury employment on the first or second shifts as a greeter or answering the telephones, positions that the store manager believed did not require repetitive motion and which would thereby be within plaintiff's work restrictions. The store manager also testified that she orally offered plaintiff a position on the third shift to monitor the sidewalk sale. Plaintiff confirmed the oral discussion concerning an offer for the greeter position on the first or second shift, but she stated that she could not accept the position because she had no one to take care of her children during those shifts. Plaintiff worked the third shift because of her childcare needs. Plaintiff also expressed that the monitoring position was only for one week and that she did not accept this position because it was not safe. Defendant-employer did not submit a written job description for these positions with the treating health care provider who provided the work restrictions. Plaintiff did not return to work for defendant-employer and was subsequently terminated.
9. Taking into account the recency of plaintiff's injury and the uncertainty of the nature and extent of that injury, the first and second shift positions were not suitable because of plaintiff's childcare needs. The monitoring position was also not suitable, and even if it might be considered suitable, plaintiff justifiably refused it.
10. Plaintiff's workers' compensation claim was denied and no weekly indemnity benefits were paid. Defendant-employer provided some medical benefits.
11. Kathryn Hodges, a physician's assistant, first saw plaintiff at the employer's request on June 24, 1998. At that examination, plaintiff presented with bilateral tenderness in both hands for about two weeks and pain for three or four months. Plaintiff had positive Phalen's and Tinel's test bilaterally and was diagnosed by the physician's assistant with a repetitive motion injury, bilateral hands and wrists, consistent with carpal tunnel syndrome. Plaintiff was prescribed an anti-inflammatory, rest for both hands, and wrist splints. Ms. Hodges testified that it was likely that plaintiff's condition was tenosynovitis and that the distinct differentiation between carpal tunnel syndrome and tenosynovitis must be made by an orthopaedist. At the June 24, 1998 visit, Ms. Hodges completed a workers' compensation request for medical care form which expressed the diagnosis of bilateral repetitive motion injury and imposed work restriction of no repetitive motion.
12. On July 6, 1998, plaintiff was again seen in the Knightdale Primary Care Center, where she was examined by Dr. Suh. Plaintiff continued to complain of symptoms consistent with carpal tunnel syndrome or tenosynovitis, and Dr. Suh recommended that her activities be limited to light duty.
13. Ms. Hodges again saw plaintiff on July 13, 1998, at which time plaintiff indicated an improvement in symptoms since ceasing her employment with Wal-Mart. Ms. Hodges continued to opine that plaintiff had carpal tunnel syndrome and/or tenosynovitis and was subsequently either referred to or did see an orthopaedist.
14. On the issue of causation, Ms. Hodges testified that plaintiff's symptoms were consistent with a repetitive motion injury, particularly carpal tunnel syndrome and/or tenosynovitis, and that plaintiff's job duties were a substantial contributing factor in the development of her symptoms. Ms. Hodges testified that members of the general public are not equally exposed to the type of repetitive motion plaintiff performed in her employment and that plaintiff, during the time Ms. Hodges provided treatment to plaintiff, was totally disabled from her normal job duties as a result of her injury.
15. James R. Post, M.D., a board certified orthopaedic surgeon with expertise in the field of hand surgery, saw plaintiff on referral from State Vocational Rehabilitation. Dr. Post first saw plaintiff on November 5, 1998, for complaints of bilateral hand pain. Dr. Post's examination revealed complaints consistent with bilateral de Quervain's tenosynovitis and mild bilateral carpal tunnel syndrome. Dr. Post initially treated plaintiff with splints and anti-inflammatory medication.
16. On December 3, 1998, Dr. Post again saw plaintiff. At this visit, for the first time, plaintiff complained of pain in her left thumb, which Dr. Post believed to be synovitis of the left thumb. Dr. Post gave plaintiff a diagnostic injection for suspected carpal tunnel syndrome that was not helpful in relieving her symptoms. The failure to obtain relief from the injection was suggestive that plaintiff's complaints were not related to carpal tunnel syndrome.
17. In subsequent visits, Dr. Post ordered a triple phase bone scan of the upper extremities and nerve conduction studies. The nerve conduction studies were performed to rule out carpal tunnel syndrome. The bone scan was essentially negative. There was questionable synovitis of the left radio carpal joint, but Dr. Post did not believe that plaintiff's symptoms were caused by this slightly positive finding.
18. During follow-up appointments with Dr. Post over the several months, plaintiff described a gradual progression of her symptoms from specific complaints consistent with tenosynovitis to general complaints of bilateral pain and numbness for which Dr. Post was unable to form a diagnosis.
19. Dr. Post initially testified that plaintiff had de Quervain's tenosynovitis of both hands and synovitis of the left thumb, both of which were caused by her employment with defendant-employer. Dr. Post, however, subsequently testified that the synovitis of the left thumb did not appear until December 3, 1998, and that it would not take five months for these symptoms to appear; he thus concluded that the de Quervain's tenosynovitis is related to plaintiff's employment with defendant-employer, but he was unable to relate her other symptoms to her employment.
20. As found by Dr. Post, plaintiff's tenosynovitis had completely resolved and her tests for this condition were negative by December 31, 1998. His examinations, the failed injection, and other diagnostic tests ruled out the preliminary diagnosis of carpal tunnel syndrome.
21. Although Dr. Post testified that plaintiff's bilateral tenosynovitis was caused by plaintiff's employment, he was unable to reach a diagnosis concerning plaintiff's other, diffuse complaints. Dr. Post explained that these other symptoms seemed to change with each visit and that he was unsure that these symptoms were related to her employment. Dr. Post testified that plaintiff's current complaints could be psychogenic hand pain, rheumatologic problems, causalgia, or reflex sympathetic dystrophy. As he was uncertain of the diagnosis for these complaints, Dr. Post suggested that referral to a multi-disciplinary pain clinic, such as the Cedar Neurology Pain Clinic, would be beneficial.
22. At the time of his deposition, Dr. Post gave several opinions concerning plaintiff's work restrictions and ability to return to work. Although Dr. Post opined that plaintiff could return to her former employment with restrictions, he did not indicate that the restrictions were necessary because of the work-related injury, i.e., the tenosynovitis that had resolved, or the other symptoms which he could not relate to her employment.
23. At the referral of the State Vocational Rehabilitation plaintiff was seen by Gregory M. Bertics, M.D., a neurologist at Cedar Neurology Pain Clinic in Raleigh. Dr. Bertics first saw plaintiff on April 16, 1999, at which time plaintiff presented with complaints of pain and numbness in her hands and arms. A neurological examination was performed which noted the following mild findings: some swelling of the right wrist, a positive Phalen's sign in the right wrist, and subjective complaints of numbness. Plaintiff had normal sensation and normal strength in her hands, some slowness of rapid movements of the right hand, and the remainder of the examination was essentially normal. Dr. Bertics' initial diagnosis was paresthesia with some concern that there might be some type of nerve root injury suggestive of carpal tunnel syndrome or other type of nerve injury. He also considered the possibility that plaintiff had some non-neurologic problem such as tendonitis or reflex sympathetic dystrophy. Dr. Bertics did not have the benefit of Dr. Post's records.
24. Dr. Bertics requested an EMG and nerve conduction testing, and the results were unremarkable. There was no evidence of a carpal tunnel syndrome or any type of nerve injury.
25. Dr. Bertics indicated that plaintiff's complaints were suggestive of possible tendonitis, a dermatological condition, arthritis (rheumatoid or osteoarthritis), phlebitis, an infection, or causalgia (reflex sympathetic dystrophy).
26. On June 17, 1999, Dr. Bertics released plaintiff from his care having ruled out a nerve injury, and questioning whether plaintiff may have tendonitis or reflex sympathetic dystrophy. Dr. Bertics suggested that it might be prudent to perform a three-phase bone scan to answer the question concerning reflex sympathetic dystrophy. He was unaware of Dr. Post's treatment and the tests which had already been performed.
27. In the course of Dr. Bertics' deposition he was questioned concerning the three-phase bone scan that was performed at the request of Dr. Post. Dr. Bertics stated that a positive bone scan would be highly suggestive of causalgia (reflex sympathetic dystrophy). After reviewing the bone scan report, Dr. Bertics testified that the study was consistent with mild left tenosynovitis and was not indicative of reflex sympathetic dystrophy.
28. Dr. Bertics rendered an opinion that plaintiff's symptoms were related to her employment and testified that although he had not diagnosed the condition causing plaintiff's symptoms, he related the symptoms to employment because of the temporal relationship between the activities and the onset of the symptoms. Because Dr. Bertics did not have Dr. Post's records, he was not aware that plaintiff's symptoms changed during the course of Dr. Post's treatment.
29. Having considered all of the evidence, the Commission finds that the opinions of Dr. Post are entitled to greater weight than those of Ms. Hodges or Dr. Bertics. Ms. Hodges is not a physician and testified that an orthopaedist is more qualified than she to determine whether plaintiff's complaints are caused by carpal tunnel syndrome or tenosynovitis. Dr. Bertics did not see plaintiff until April 1999, several months after the tenosynovitis had resolved, was not aware of Dr. Post's diagnostic tests, particularly the results of the bone scan, and apparently was not aware of the changes in plaintiff's reported symptoms as noted by Dr. Post. Further, Dr. Bertics' opinion concerning causation is based in large part, if not solely, on the temporal relationship between the work activity and the symptoms as related to him by plaintiff. His opinion is thus based on the inaccurate history that all of plaintiff's symptoms started soon after she began her work activities with defendant-employer. The more credible evidence shows that the undiagnosed, more diffuse complaints did not arise until December 1998, several months after the initial onset and after plaintiff had ceased her employment with defendant-employer.
30. Dr. Post is a qualified orthopaedic surgeon who specializes in hand conditions. Dr. Post saw plaintiff on more than one occasion and close in time to the date of injury. Dr. Post was treating plaintiff during a time period when her symptoms significantly changed. In contrast, Dr. Bertics first saw plaintiff after her tenosynovitis had resolved and when she was making complaints of non-descript, general pain and numbness, which neither Dr. Post nor Dr. Bertics could diagnose.
31. From and after June 24, 1998, until and through December 31, 1998, plaintiff was incapable because of her compensable injury to perform her former employment with defendant-employer, or other suitable employment at the same wages for the same number of hours.
32. On August 3, 1998, plaintiff began to work for a daycare center at Gold's Gym. Plaintiff worked an average of 25 hours per week at $6.00 per hour until December 15, 1998, when her hours were diminished. Plaintiff then began working at the daycare center at Ladies Fitness and Wellness. Plaintiff worked approximately 20 hours per week at $6.00 per hour until approximately three or four weeks prior to the deputy commissioner's hearing on May 24, 1999, when her hours were reduced to 16 hours per week. In these positions plaintiff performed cleaning duties including wiping tables, cleaning mirrors, vacuuming floors, dumping toys in liquid to sanitize them and removing them from the liquid. These were reasonable efforts to attempt to return to work. Plaintiff's change of jobs and diminution of hours was not related to her occupational disease.
33. Plaintiff's bilateral de Quervain's tenosynovitis was the result of trauma in her employment with defendant-employer.
34. The evidence fails to show by the greater weight that plaintiff's complaints after December 31, 1998, were caused by her employment with defendant-employer.
35. Plaintiff does not have carpal tunnel syndrome or reflex sympathetic dystrophy.
36. The medical treatment by Dr. Post was reasonably necessary to effect a cure, give relief, or lessen plaintiff's period of disability.
37. According to the Form 22 stipulated into the evidence by the parties plaintiff's average weekly wage is $304.99, which yields a compensation rate of $204.34 per week.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The Industrial Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. N.C. Gen. Stat. § 97-86; see Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000); Adams v. AVX Corp., 349 N.C. 676, 680,509 S.E.2d 411, 413 (1998). Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions removed from the ordinary experience of laymen, only an expert witness can give a competent opinion as to the nature of and the cause of the injury. Young v. Hickory Business Furniture, supra; Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). Expert opinion that rests on speculation and conjecture is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of an injury or disease. Young v. Hickory BusinessFurniture, supra; Dean v. Carolina Coach Co., 287 N.C. 515. 522,215 S.E.2d 89, 94 (1975).
2. Plaintiff sustained a bilateral de Quervain's tenosynovitis by trauma bilaterally in the course and scope of her employment for defendant-employer. N.C. Gen. Stat. § 97-53(21).
3. As a result of her contraction of the compensable occupational disease of bilateral tenosynovitis, plaintiff is entitled to temporary partial disability compensation at the rate of two-thirds of the difference between her pre-injury average wage of $304.99 and her wages earned at Golds Gym and Ladies Fitness and Wellness, from June 24, 1998, and continuing through and including December 31, 1998. G.S. § 97-30.
4. Plaintiff is entitled to payment of all medical treatment reasonably required to effect a cure, give relief, or lessen plaintiff's period of disability, including treatment by Dr. Post and Knightdale Primary Care through December 31, 1998. N.C. Gen. Stat. §§ 97-25,97-25.1.
 ***********
Based on the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay plaintiff temporary partial benefits at the rate of two-thirds of the difference between her pre-injury average weekly wage of $304.99 and her post-injury wages from June 24, 1998, until and including December 31, 1998. These amounts have accrued and shall be paid to plaintiff in a lump sum, subject to the reasonable attorney's fee approved herein.
2. To the extent that the same was reasonably designed to diagnose, cure, give relief or lessen the period of disability, defendants shall pay the reasonable medical expenses incurred by plaintiff as a result of her compensable occupational disease, including the treatment, tests, and examinations by or at the direction of Dr. Post and Knightdale Primary Care, through December 31, 1998.
3. A reasonable attorney's fee in the amount of twenty-five (25) percent of the compensation due plaintiff under paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid in a lump sum from plaintiff's AWARD.
4. Defendants shall bear the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER